### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

|                                    |        |                                 |
| ---------------------------------- | ------ | ------------------------------- |
| ALAN STANTON SNEAD                 | :      |                                 |
| Petitioner                         | :      |                                 |
| v.                                 | :      | Civil Action No. WMN-09-2080    |
| BOBBY SHEARIN, WARDEN, et al.      | :      |                                 |
| Respondents                        | ..o0o..|                                 |

### MEMORANDUM

This matter is before the Court on Alan Stanton Snead's counseled Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. ECF Nos. 1 and 6.  Respondents, Warden Bobby Shearin and Douglas F. Gansler, Attorney General of the State of Maryland, by their counsel, have filed a response requesting dismissal of the Petition (ECF No. 19) to which Snead has filed a Reply. ECF Nos. 24 and 25.  Snead, who is challenging his conviction in 1995 for first-degree murder and unlawful use of a handgun in the Circuit Court for Baltimore City, claims he received ineffective assistance of counsel: 1) on direct appeal from his trial in 1995, and 2) at a *Batson*[1] remand hearing following his direct appeal from his second trial. ECF No. 6 at 2. A hearing is unnecessary to resolve the issues raised by Petitioner. *See* Rule 8, "Rules Governing Section 2254 Cases in the United States District Courts" and Local Rule 105.6 (D. Md. 2011). For the reasons that follow, the Petition will be denied.

### PROCEDURAL BACKGROUND

Snead and his co-defendant Donald Booze were each convicted of the murders of Antonio Henderson and Isaac Durant, who were shot to death in the 3100 block of Woodland Avenue in Baltimore City.  ECF No. 1 at 5. The protracted procedural history of this case is summarized as follows.

---

[1] *See Batson v. Kentucky*, 467 U.S. 79 (1986).

### 1.  First Trial

On November 26, 1991, a jury sitting in the Circuit Court for Baltimore City convicted Snead and his co-defendant each of two counts of first-degree murder and one count of unlawful use of a handgun. Snead was sentenced to two life sentences and a ten year sentence. ECF No. 1, Ex. 1. On January 4, 1993, the Court of Special Appeals of Maryland reversed the convictions of both defendants due to an erroneous ruling by the trial court involving rebuttal testimony. *See Booze v. Maryland*, 617 A. 2d 642 (Md. Ct. Spec. App. 1993), *aff'd*, 637 A.2d 1214 (Md. 1994).

### 2.  Second Trial

In 1995, Snead and Booze were retried and each convicted of two counts of first-degree murder and one count of unlawful use of a handgun after a jury trial in the Circuit Court for Baltimore City.  Snead and Booze each received two consecutive life sentences for the murders and a consecutive 10-year sentence for the handgun violation. ECF No. 1, Ex. 1; *Booze v. State,* 698 A.2d 1087 (Md. 1997).

### 3.  Direct Appeal

Snead and Booze, represented by separate counsel, filed a consolidated direct appeal to the Court of Special Appeals of Maryland.  Snead was represented on appeal by Michael Braudes, an Assistant Public Defender ("Original Appellate Counsel"), who argued *inter alia* that the "[t]rial court erred in its handling of a defense challenge to the state's exercise of peremptory challenges pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986)."  ECF No. 1, ¶ 11.  Snead did not join in an issue raised by co-defendant Booze that the Circuit Court's jury selection procedure violated a defendant's right to "comparative rejection." [2]

On August 28, 1996, the Court of Special Appeals of Maryland vacated Snead's conviction based on his *Batson* claim, ruling that the State failed to set forth a race-neutral reason

---

[2]  Prior to the exercise of peremptory challenges, the court must provide a list of qualified jurors sufficient to allow a jury and alternates to be selected after the exercise of peremptory challenges. *See infra*, p. 21.

for striking a prospective female African-American juror from the venire.  The case was

remanded to the Circuit Court for Baltimore City for the limited purpose of permitting the State

to explain why the juror was stricken. ECF No. 1, Pet. Ex. 5, *see also Booze v Maryland*, 681 A.

2d 534 (Md. Ct. Spec. App. 1996).   In the same opinion, the Court of Special Appeals rejected

Booze's comparative rejection argument.  The Court concluded that Booze had not been

prejudiced because he had failed to exhaust his peremptory strikes.  ECF No. 1, Pet. Ex 5 at 14-

15; *Booze*, 681 A.2d at 543-47.   While Snead's case returned to the Circuit Court for further

proceedings, Booze filed for, and was granted, further review before the Court of Appeals of

Maryland.  ECF No. 1, Exhibit 8; *Booze v. State*, 698 A.2d 1087 (Md. 1997).

### 4. *Batson* Remand Hearing

Snead retained Thomas Kane, Esq. to represent him at the remand hearing. On March 11,

1997, the Circuit Court for Baltimore City held the remand hearing, determined that the State's

proffered race-neutral reason for striking the juror was credible, and denied Snead's *Batson*

challenge. This had the effect of reinstating Snead's April 25, 1995, conviction. ECF No. 1, Pet.

Ex. 6.

On May 9, 1997, the Circuit Court for Baltimore City sentenced Snead to two life sentences

and a ten-year sentence, each sentence to be served consecutively.  At sentencing, Kane filed in

open court a notice of appeal and served the State. Pet. Ex. 1, Ex. 7 at 15.  Snead's direct appeal

was never docketed by the Court of Special Appeals, however, and was not further pursued by

Kane.  ECF No. 1. Ex. 2.

### 5. Post-Conviction Petition

While Snead's case was on remand in the Circuit Court for Baltimore City, the Court of

Appeals of Maryland considered and reversed Booze's conviction, finding that the Circuit Court

had erroneously required Booze and Snead to exercise their peremptory challenges without a full

panel of prospective jurors before them, in violation of Maryland Rule 4-312(g).  ECF No. 1, Ex.

3

8; *see also Booze*, 698 A.2d 1087 (Md. 1997).

On June 29, 1998, Snead filed for post-conviction relief in the Circuit Court for Baltimore City.  He claimed Original Appellate Counsel, Michael Braudes, rendered ineffective assistance on direct appeal from the 1995 conviction by failing to raise comparative rejection. It appears that Snead's post-conviction counsel, also an assistant public defender, did not recognize Snead's direct appeal from the *Batson* hearing was unperfected and unresolved.

The Circuit Court for Baltimore City conducted an evidentiary hearing on Snead's post-conviction petition, and on February 8, 2002, ruled Original Appellate Counsel was ineffective for failing to raise comparative rejection on direct appeal.  Snead was granted leave to file a "belated appeal" to present the issue to the Court of Special Appeals. ECF No. 1, Ex. 13.   The State filed for and was granted leave to appeal that decision.[3]

On October 10, 2003, the Court of Special Appeals  of Maryland vacated the post-conviction court's decision finding that Original Appellate Counsel rendered ineffective assistance and remanded the case to reconsider whether Original Appellate Counsel's performance was objectively deficient based on the state of the law and facts as they existed at the time of  appeal. ECF No. 1, Ex. 14.

On remand, the post-conviction court  determined Original Appellate Counsel's performance was not objectively unreasonable at the time of appeal under the holding set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and denied relief. ECF No. 1, Pet. Ex. 15. Snead's Application for Leave to Appeal Denial of Post-Conviction Relief was denied on December 23, 2005.

### 6.  Motion to Reopen Post Conviction

On December 11, 2006, Snead filed a Motion to Reopen Petition for Post-Conviction Relief, arguing his counsel at the *Batson* hearing, was ineffective for failing to perfect or pursue

---

[3]   On February 25, 2003, attorneys from the law firm currently representing Snead on a pro bono basis entered their appearance.  ECF No. 1, Ex. 2 at  8.

direct appeal, or that court personnel had deprived Snead of due process by failing to docket his appeal.  ECF No. 19, Ex. 6 at 7.  The Motion to Reopen Petition was denied summarily on December 20, 2006. *See id.* Ex. 7.  On January 16, 2007, Snead filed an Application for Leave to Appeal the Denial of Motion to Reopen Petition for Post-Conviction Relief.

### 7.  **Belated Out-of-Time Direct Appeal from Circuit Court's *Batson* Ruling**

On June 12, 2007, the Court of Special Appeals considered Snead's appeal of the denial of his Motion to Reopen Petition and granted him the right to file an out-of-time appeal. ECF No. 1, Ex. 17.  On appeal, Snead argued the Circuit Court for Baltimore City had erred by finding the reasons proffered by the State for striking the juror to be credible, and that the Circuit Court had relied on the State's erroneous representation that the stricken juror had been replaced by another African American female. After briefing and argument, on January 23, 2008, the Court of Special Appeals affirmed the Circuit Court's *Batson* decision. ECF No. 1, Ex. 18.  Snead's Petition for Writ of Certiorari to the Court of Appeals was denied on May 9, 2008. ECF No. 1, Ex. 21.

### 8.  **Motion to Reopen Post-Conviction Proceedings**

On May 8, 2009, Snead filed a second Motion to Reopen Petition for Post-Conviction Relief to permit him to present evidence and argument that he had been denied effective assistance of counsel at the March 11, 1997, *Batson* remand hearing. ECF No. 1, Pet. Ex. 22.  On January 22, 2010, the State filed a response opposing the Second Motion to Reopen. ECF No. 19 Ex. 13.  On February 3, 2010, the Circuit Court for Baltimore City denied the Motion without comment. ECF No. 19, Resp. Ex. 14.  On March 5, 2010, Snead filed an Application for Leave to Appeal the denial.  ECF No. 19, Resp. 15.  On July 15, 2011, the Court of Special Appeals of Maryland summarily denied leave to appeal. ECF No. 19, Resp. 16.

### 9. Federal Habeas Petition

On August 6, 2009, Snead filed his § 2254 Petition with a Motion to Stay and Hold Federal Habeas Corpus Proceedings in Abeyance Pending Exhaustion of State Remedies (ECF No. 2). After briefing, this Court granted the Motion, staying and holding in abeyance all further proceedings while Snead's Second Motion to Reopen (ECF No. 1, Exhibit 22) was before the Circuit Court and on appeal.[4]  On August 26, 2011, the court granted Snead's Motion to lift the stay on this habeas proceeding. ECF No. 16.

## FACTS

### 1. Jury Selection

During jury selection for Snead and Booze's 1995 trial, jurors were chosen from three separate venire panels.  ECF No. 1 Ex. 3 at 20-24, 242-43, ECF No. 19 Ex. 17 at 6-10.  Counsel for both Defendants asserted the jury panel was too small given the number of available peremptory strikes, thus depriving Defendants of informed and comparative rejection. Nonetheless, the Honorable Kenneth L. Johnson decided to continue jury selection as is demonstrated by the following excerpt from the voir dire.  During the proceeding, Kirk Osborn, Esq., represented Snead, Thad Lautz, Esq., represented Booze, and Assistant State's Attorney Carolyn Starks-Saxon represented the State of Maryland.

> MR. OSBORN:  If they [remaining venire members] do have to be excused, Judge, we may not have enough to select a jury either, given that there are 60 strikes between the State and Defense in this matter.
>
> THE COURT: The only thing I know to do is to call them up and see.
>
> MS. STARKS-SAXON:  Your  Honor—
>
> THE COURT:  Do you have a better way of doing that? Let's hear from the Defense. Mr. Osborn?

---

[4] *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (stay and abeyance may be granted for good cause).

MR. OSBORN:  I do not, Judge.  I would assert that, I believe we have a right to select our jury out of one panel under the theory of comparative rejection. Since the way one selects a jury is to knock off those people one feels are less desirable than upcoming jurors are if two panels are used; and I do believe the principle of comparative rejection is accepted to some degrees by the Maryland courts, that we are entitled,--

THE COURT: What Maryland court?

MR. OSBORN:  --one panel.  I don't have—I didn't anticipate this coming up.

THE COURT: What Maryland court?

MR. OSBORN:  I don't have a cite on me, because I didn't anticipate this. So, if your Honor wanted to give me some time, I could try to find one, but that would be our position.  We would like to pick the jury from one panel.

**************************

THE COURT:  Mr. Lautz.  What do you say?

MR. LAUTZ:  I think the only way to find out is to ask them each, bring them up. It's the only way we're going to be able to get through the voir dire and the purposes of the voir dire; and secondly, from what you said, I think that the purposes of our voir dire are only going to be met if we can judge one panel.

Now, if this panel will not be enough after we go through this selection process, then I would ask you to dismiss the entire panel, so that we can look at the next panel with the same eyes that we had to look at these ones, and judge the next panel the same way we have to judge these ones.  Otherwise, the voir dire is basically meaningless, and our questions are basically meaningless—

THE COURT:  Well- -

MR. LAUTZ:   -- because we get to find nothing about that individual panel.

THE COURT:   Everyday this Court and on a regular basis uses two, and, have on occasion, we used three panels, and I'm going to feel free to do that if the necessity requires that until I know differently by the Maryland Court of Appeals. And this comparative rejection theory, as far as I'm concerned is no good until the Court of Appeals tells me it's good; and of course, I'm going to obey the law and follow it.  But until such time as they do, I'm not.  I don't see where it has any merits whatsoever.

We have to get the jury at some point in time.  If we have to use one panel, two panels, or three panels, how in the world is anybody hurt, and if you show me that you are hurt, then you get relief, but that showing will be on you.

> MR. LAUTZ:      Can I make that proffer then to show you how I am hurt?
>
> THE COURT: You can just be quiet for right now.

ECF No. 1, Ex. 3 at 20-23. Jury selection continued for two days and three jury venires were

empanelled before the jury was finally selected. ECF No. 1 Ex. 3 and 4 at 208.

During the course of jury selection, Snead's trial counsel raised a *Batson* challenge:

> MR. OSBORN:      Before commenting on whether the jury as constituted is
> acceptable, I would like to put on the record I am making a *Batson* challenge at
> this time.  The State, as far as I can recollect, has used all their strikes on African
> American jurors, many of whom who did not even approach this bench to venture
> an opinion about anything.
>
> MS. STARKS-SAXON:  Your Honor, that not- -
>
> THE COURT: Wait just a minute, please.
>
> Well, State's first challenge was a white female.
>
> MR. OSBORN:      I didn't have the first one, so I could be wrong on that.
>
> THE COURT:  Excuse me.
>
> MR. OSBORN:      Excuse me.
>
> THE COURT:  Excuse me, white male.
>
> MR. OSBORN:      Excuse me then.
>
> THE COURT:  The first one was a white male.  The second one was a black
> male. The third one was a black female.  The fourth one was a black female, and
> the fifth one was a black female.  That was the State.  And, you, Mr. Osborne, the
> first was a black male, No. 2, white male, No. 3, white female, No. 4, black male,
> No. 5, white female, No. 6. white male, No 7, white female, No. 8, white male,
> No. 9, black male, and No. 10, white female.
> In any event, now State, it's your turn—
>
> MS. STARKS-SAXON:   Well, Your Honor- -
>
> THE COURT:   -- to respond to *Batson*.
>
> MS. STARKS-SAXON:   Well, the first thing I want to say my first one was
> against a non-black person. The other three- - the other four I had reasons. I
> believe I can articulate every one.

8

THE COURT:  Yes, you have to articulate them.

MS. STARKS-SAXON:   Your Honor, this is how I had written down the strikes. I know the first guy, he was juror number-- he was a young black male. He was chewing gum and he was acting [in a] very lackadaisical manner, and when he walked out, he said see you.  He didn't want to be on call.  I think that was Juror No.—I think it was either 9 or 10.

The other black female was the lady who was pregnant.  This trial is going to take a little while.  I thought, even if she thought she could take it, from my own experience with being pregnant, and she is a little ways along in pregnancy.  She's going to the bathroom a lot.  That's why I struck her.

Let me see what else.  The last black female, I struck her, because she lives in the area, or I think she might live in the area on Rogers Avenue, and I didn't want there to be any conflict or fear because of what she's going to hear, because that may upset her--.  And the other black female-- I don't remember which one that was.  I'm not really sure who she was.  But, anyway, the reason for it--

THE COURT:  Well, I know she was young.  If I recall correctly, that one had on a pair of blue jeans, stone-washed jeans if I'm right on that.  I can't remember the number.

At any rate, any response, Mr. Osborne?

MR. OSBORN:   Yes.  I don't think pregnancy is a woman-- a reason to keep a woman off a jury, nor do I think chewing gum is.  What they said after they were excused by Ms. Saxon has nothing to do with the reasons they were excused.

THE COURT:  Your motion is denied.

See *id*. at 101-103. Counsel for Booze subsequently raised a *Batson* challenge. ECF No. 1, Ex, 3 at 107-08.   At the conclusion of voir dire, the trial judge observed that Snead had exercised nineteen of his twenty peremptory challenges.  ECF No.  26, Suppl. Ex. 4 at 214.

## 2.  Joint Direct Appeal

Snead and Booze, represented by separate counsel in their joint appeal, raised the following claims on appeal.

Both Appellants

I. Did the trial court err in overruling defense counsels' *Batson* challenges to the prosecutor's exercise of certain peremptory strikes?

II. Did the trial court err in denying appellants' motions for a mistrial after a witness testified to the "drug reputation" of the defendants?

III. Did the trial court err in overruling defense objections to certain remarks made by the prosecutor in opening statement and closing argument?

<u>Snead Only</u>

IV. Did the trial court err in restricting the cross-examination of a key State's witness?

<u>Booze Only</u>

V. Did the trial court err in allowing the prosecutor to present photographs of the murder victims to a State's witness?

VI. Did the trial court err in denying appellant Booze his right to properly exercise his peremptory challenges?

ECF No. 1 Ex. 5 at 5; ECF No. 19 Exhibit 1 at 2.[5]

The Court of Special Appeals of Maryland ruled the trial court had failed to give the prosecutor an opportunity to tender a race-neutral reason for striking one of the jurors, a thirty-one year old female named Lisa Portis, and remanded Snead's case to give the State an opportunity to explain why the juror had been stricken. ECF No. 1, Ex. 5 at 6.  Although Booze raised the same claim on appeal, he was not granted relief because he had not preserved the issue at trial. *See id.*

Appellants' remaining claims were denied, including Booze's comparative rejection claim.  As to that claim, the Court of Special Appeals observed "Booze's claim must fail simply because he had not exhausted his peremptory challenges when the jury was seated and the case proceeded to trial." *Id.*  at 14-15.  Accordingly, Booze's conviction was affirmed in its entirety on direct appeal.

---

[5]   Neither party has provided this Court with a copy of Snead's appellate brief.

### 3.  Booze's Convictions Reversed by the Court of Appeals of Maryland

On August 26, 1997, The Court of Appeals of Maryland reversed Booze's convictions,

holding that he had been denied his right to comparative rejection as required under Maryland

Rule 4-312(g).[6]  The Court held:

> "… to the extent possible, the parties should have before them the entire pool of prospective jurors before being required to exercise any of their peremptory challenges. That intent is not, in any sense, inconsistent with the basic notion that the function of peremptory challenges is to reject rather than to select jurors. It simply manifests the belief that the parties should have the right to exercise their rejections intelligently and strategically, and that they can better do that if they have the full panel of prospective jurors before them.

ECF No. 1, Pet Ex. 8; *see also Booze,* 347 Md. 51 at 69.  The Court of Appeals ruled the trial

court's decision to require the parties to exercise peremptory strikes when the venire was

insufficient to allow all of the strikes to be exercised constituted reversible error. *See id.* The

Court of Appeals concluded even though Booze had not exhausted all of his remaining

peremptory challenges, the error was not harmless and remanded Booze's case for a new trial.

*See id.* 347 Md. at 70, 698 A.2d at 1097. [7]

### 4.  Snead's Remand

On March 11, 1997, the trial court held a hearing on the whether the State had violated

*Batson* by striking prospective Juror 14, Lisa Portis, from the panel.  ECF No. 1, Ex. 6 at 4.

Assistant State's Attorney Starks-Saxon told the court that she had consulted her file to

reconstruct her recollection and testified:

> From my – I have my original witness list with my notes on it. I notice

---

[6]  *See infra*, p. 21.

[7]  Booze was tried a third time in 1999. The Maryland Judiciary Website indicates he was convicted of two counts of second-degree murder and two counts of a related handgun offense and sentenced to thirty years on each murder conviction and three years for each had gun offense.  *See* Criminal Case  Nos. 191247014 and 191247016;  http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=191247014&loc=69&detailLoc=DSK8, This information is inconsistent with an observation made by the Court of Special Appeals of Maryland that Booze "struck out" at the conclusion of his third trial and was convicted of two counts of first-degree murder and his sentence remained two consecutive life sentences and a consecutive sentence for use of a handgun.  ECF No. 1, Ex. 14 and 26 (supplement to Ex. 14).

> for Juror No. 14, which is the one that was at issue in this case, she was a
> student, she was thirty-two and she had an address of Fairmont Avenue.
>
> I had put students in brackets and I had put a question by her address
> because I believe I was concerned about whether or not she lived near the
> crime scene in this case.
>
> If the Court will remember, this case involved a situation where Mr.
> Snead and Mr. Boozer [sic] was [sic] accused of shooting Antonio Henderson
> out in front of his house one night, it was a summer evening, and, in fact, his
> mother was upstairs – Antonio Henderson's mother was upstairs in her home
> when this occurred, and the police testified during the trial, if I'm not
> mistaken, that she was there.
>
> Well, in any event, Mr. Booze and Mr. Snead had set Mr. Henderson
> up in a crossfire and in the course of killing him they also killed Isaac Durant
> and this was like around – it was in the early evening on a summer day and
> there were a lot of people on the street.
>
> And I do remember that we had problems with the witnesses coming in
> because Mr. Snead, who was also known as Cookie Man, and Mr. Booze, who
> was known as Butt Butt (phonetic), that was their territory and the witnesses
> were terrified. I remember that.

ECF No. 1, Ex. 6 at 4-5.   Starks-Saxon explained that a protective order had been granted

because one of the State's witnesses was afraid to testify.  "I also- so I believe that's one of the

reasons I had put Fairmont Avenue, question mark and student regarding that lady." *Id*. at 5.

In regard to her concern about whether Juror 14 (Lisa Portis) was a student, Starks-

Saxon explained:

> But if I'm not mistaken, when I struck her, Juror No. 50 was picked
> because – Tom [Kane], you can see this. Juror No. 50 took Juror
> No. 2's place when Juror No. 14 was struck and that was replaced by an
> older woman who was fifty-nine and a machine operator.
>
> And I do know that generally my pattern is to try to get an older, more
> mature jury, especially in a serious case because I find that older people who
> are a little bit more seasoned in life, they tend to bring back judgments
> which reflect the reality of our world and they're not afraid.
>
> So to the best of my recollection, Your Honor, I had some concerns
> about Ms. Lisa Porter's [sic] status in terms of her address and the fact that
> she was a student and the person that took her stand, took her place was Ms.

Glenda Bartram who was a female who was older and to the best of my recollection, that's why I struck her because – and I remember when looking at the tape that I couldn't articulate it as easily as I did the other ones because the reasons weren't all there together.

*Id*. at 5-6.  She concluded: "So those are all the reasons I believe I struck that young lady and it had nothing to do with race." *Id*. at 7.

Remand counsel Kane argued striking a juror based on residence was a pretext for race discrimination. *See id*. at 5.  He questioned the prosecutor's proffered reasons for striking the juror, adding "…if her rationale is that this person may have lived a little bit too closely to the scene, this juror didn't respond to any of the voir dire that would have identified her as an individual who had knowledge of the scene, had knowledge of the individuals, had any kind of fear for sitting.  *See id*. at 8.  "[I]t's very easy for the State to claim that witnesses are afraid because it's very easy for witnesses simply out of a reluctance to participate to say I'm very much afraid," *id*. at 9, and argued that to strike a juror who lives to close to an area when that juror has not given any reason they could not sit on the jury is not a legitimate reason to strike. *See id.*

The remand court inquired about the race of the juror who immediately replaced Portis, and both sides agreed prospective Juror 14 (Portis) was replaced by an African American female. *See id*. at 9-10.[8]  Kane asserted that striking a juror for age was improper.  *Id*. at 10-12. Starks-Saxon explained to the court that she wanted an older person because once of the victims had been shot in front of his mother's house.  *See id*. at 13.  "She was replaced with a woman that I felt could identify with the horror of that situation from a mother's point of view.  This

---

[8]  Both the prosecutor and Kane assumed incorrectly that Lisa Portis' immediate replacement was prospective juror 50, Glenda Bartram, an African-American female, as opposed to Juror 174 Dorothy Flowers, also an African-American female.  The remand transcript suggests the inquiry made by the court was specific to whether Portis' immediate replacement was an African American female, which was in fact the case.  ECF No. 1, Ex. 6 at 9-10. Flowers and two other prospective jurors were stricken by the State before David Kidd, white male, was ultimately seated.  Snead does not claim the strikes against Flowers or the two other potential jurors were unlawful.

was all part of my trial strategy." *See id*. at 13.   Stark-Saxon reiterated to the court that her

decision to strike the potential juror "had nothing to do with race and I was concerned—I do

know from my own notes that I had down here a question about her status as a student and

about her address.  I wasn't sure whether Fairmont was in or near where this occurred because

Mr. Snead, who is also known as Cookie Man, him and Butt Butt (Booze) were very well

known there. That was their territory." *Id*.  at 14; *see also id.* at 5 (noting witnesses were

terrified of Defendants and a protective order had been issued).   Snead's counsel responded that

it was improper for the State to try to pick a juror based on the emotional appeal of whether or

not someone can identify with the horror that occurred on the night of the shootings. *See id*. at

15.   He asserted the State's action had violated "fundamental fairness and what a jury trial is all

about," suggesting this was "constitutionally inappropriate" and selecting an older woman who

might sympathize with one of the victim's mother harkened "back to  the old south" *Id*. at 16.

He continued "White people would be sympathetic to a White victim and would be

unsympathetic to a Black defendant.  That's exactly what we're doing here except eliminating

in one small category the race factor."  *Id*.

### 5.  First Post-Conviction Petition Proceedings

After Booze's second conviction was reversed, *see supra*, p. 4, Original Appellate Counsel

wrote to Snead, notifying him of the reversal and advising him of his right to file a post-

conviction petition. ECF No. 1, Pet. Ex. 9.   On June 29, 1998, Snead, by his counsel,[9] filed a

Petition for Post-Conviction Relief in which he claimed he had been denied effective assistance

of counsel on appeal because his appellate counsel failed to raise the issue of comparative

rejection of prospective jurors on appeal.  ECF No. 1, Ex. 10 at 1.

Braudes, an attorney with many years of experience in the Appellate Division of the Public

---

[9]  Lindsay Waite, an Assistant Public Defender in the Collateral Review Division, represented Snead in his post-conviction proceedings.  *See* ECF No. 1, Pet. Ex. 10 and 11.

Defender's Office, where he was a supervising attorney, told the post-conviction court that he

had considered raising comparative rejection on appeal and then decided against it.  ECF No. 1,

Ex. 11 at 12-13, 23.  He testified:

> Let me be absolutely as accurate as I possibly can.  Based upon what I
> remember, and what I surmise, and why I surmise it.  I have an actual
> recollection of considering the issue.  I did not reject the issue on the merits
> because I saw substantive weakness in the issue.  I rejected the issue basis [sic]
> of weaknesses in the record. Which were technical in nature.  And not because
> I thought that the issue did not have merit.  Now I'm getting into the area of
> educated surmise.  Based upon my thinking about this case. Based upon my
> review of the two appellate decision this morning, let me preface this by saying
> I do not have an actual recollection.
>
> I don't know if my recollection can be refreshed by looking at the transcript.  I
> frankly doubt it.  My best surmise, is the reason I did not raise this issue, is
> because all of the peremptory challenges were not exhausted by Defense
> counsel.  And it seemed to me, and the more I think about this, the more likely
> it is that this was my thought process.  In other words, at the end of this whole
> thing, Defense counsel still had peremptory challenges to be exercised; could
> have used those challenges against jurors in the box and decided not to do so.
>
> And under similar circumstances, where, for example, adverse rulings have
> been made on Motions to Strike for cause, lawyers in my division, including
> myself, have been unsuccessful in making arguments to the Court of Special
> Appeals. In all honesty, I do not have an actual recollection that that was the
> reasoning. But it was something awfully close to that, and that probably was it.

*Id*. at 23-25.

Later, on cross-examination, Braudes explained what he meant by "a problem with the

record." He stated "[a] problem with the record can include preservation. So if, for example, Mr.

Booze's attorney had carried the entire argument. And Mr. Snead's attorney had been silent, that

would have been a preservation problem."  *Id.*  at 26. Braudes added that not exercising all

peremptory challenges constituted a "harmless error problem" that would also qualify as a

"problem with the record."   The questioning continued as follows:

> THE STATE (Ms. Saxon):  Okay.  But the thing is, under oath, you can't
> say absolutely that that was the only reason leading this whole thing about
> the fact that didn't use all of his peremptory challenges. You can't say that
> that was the only reason that you didn't include that as an issue in your

brief.  Is that correct?

BRAUDES:  That is correct.  I cannot.

THE STATE: Okay. And you don't have independent recollection of your review of the transcript?

BRAUDES:  I had independent recollection that I thought about it.  I had independent recollection that I did not reject it on the merits.  I had independent recollection that I saw problems—a problem, or problems plural, with the record that led me to think the Court of Special Appeals is not going to reverse on this.  That's what I have actual recollection of.  What those record problems, I do not have, unfortunately, an independent recollection of.

*Id*. at 27.  The hearing was continued to obtain the trial transcript. *See id*. at 32-44.  Braudes suggested reviewing transcript might help him recall his reasons for not to raising comparative rejection on appeal. *See id*. at 28-29.  Snead's counsel told the court, "Your Honor, it's just whether or not it was preserved properly.  I think that's all you [sic] going to look at." *Id*. at 37.  The prosecutor indicated the transcript was needed to review how the Court of Special Appeals would regard the law**.** *See id*. at 38.

On October 10, 2001, the Circuit Court conducted a second hearing on the post-conviction petition. Braudes testified that his review of the trial transcript did not help his recollection of the comparative rejection issue. ECF No. 1, Ex. 12.  He testified that based on his review of the transcript, he saw:

 … an issue that had sufficient substance of merit, that I would have given it thought. I remember giving it thought. I have a vivid recollection of the thought going through my mind, that because of the technical deficiency in the record, the Court of Special Appeals is not going to reverse on this.  My best guess, reconstruction- whatever term is the likely hood [sic], is that I didn't raise the issue because all of Mr. Snead's peremptory challenges had not been exhausted.  And the great likelihood, is that because myself and my colleagues have lost lots and lots of jury selection issues on that basis in the past. Because the Court of Appeals in particular, and to some extent the Court of Special Appeals, has found waiver on that basis. That that is quite likely, what my reasoning would have been.  But going back that many years, I cannot tell you that that is the thought that went through my mind.

*Id*. at 8-9.

On February 8, 2002, the Circuit Court of Baltimore City found Original Appellate Counsel had provided ineffective assistance and granted Snead thirty days to raise the comparative rejection issue on appeal to the Court of Special Appeals. ECF No 1, Ex. 13. Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the Circuit Court held that by failing to raise the issue, Original Appellate Counsel's performance fell below an objective standard of reasonableness and Snead suffered prejudice as a result. *See id*. at 7. The court also determined that the issue had been properly preserved. *See id.* at 5-6. The State requested and was granted leave to appeal the post-conviction court's decision.

### 6. Court of Special Appeals Vacates Post-Conviction Court Finding of Ineffective Assistance

On October 10, 2003, the Court of Special Appeals vacated the judgment of the post-conviction court's decision and remanded the case to the Circuit Court with instructions to evaluate counsel's representation in light of the law applicable at the time of appeal – when Original Appellate Counsel decided not to raise the issue of comparative rejection. *See supra*. p.4.  In vacating the post-conviction court's finding of ineffective assistance, the Court of Special Appeals observed that decision assistance had relied "heavily if not exclusively" on the Court of Appeals of Maryland opinion in *Booze,* which was rendered two years after Snead's trial. ECF No. 26, Exhibit 14 (suppl.) at 8 ("The Court of Appeals decision in *Booze*, which was two years after Snead's trial, has nothing to do with appellate counsel's effectiveness, or the lack thereof, two years earlier."); *see also* i*d.* at 8-9 ("A decision based upon the Court of Appeals decision would require clairvoyance on the part of appellate counsel and be a prime example of second-guessing which we are to avoid [under *Strickland*]").  As noted, the post-conviction court determined on remand that Original Appellate Counsel's performance was not objectively unreasonable at the time of appeal under *Strickland* and denied relief. *See supra*, p. 4.

**7.  Out-of-Time Direct Appeal**

On June 12, 2007, the Court of Special Appeals of Maryland considered Snead's appeal of the denial of his Motion to Reopen his Post-conviction Petition based on trial counsel's failure to perfect his *Batson* appeal.  The Court of Special Appeals granted Snead the right to file an out-of-time appeal. ECF No. 1, Ex. 17.  *See Supra*, pp. 4-5.

In his out-of-time direct appeal, Snead argued trial court error: 1) for finding credible the reasons proffered by the State for striking Juror 14, and 2) because the Circuit Court had relied on the State's erroneous assumption that the stricken juror had been replaced by an African American female. After briefing and argument, on January 23, 2008, the Court of Special Appeals affirmed the Circuit Court's decision. ECF No. 1, Ex. 18.   The Court of Special Appeals decision stated in part:

> The issue before Judge Johnson was that aspect of Batson procedures spelled out in *Purkett v. Elem*,  514 U.S. 765, 767, 115 S. Ct. 1769, 131 L. Ed. 834 (1995):
>
>> Under our Batson jurisprudence, once the opportunity of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the <u>burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two).  If a race-neutral explanation is tendered, the trial Court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.</u>  (Emphasis supplied).
>
> With respect to that second step, the Supreme Court went on to prescribe the standard of review:
>
>> <u>The second step</u> of this process <u>does not demand an explanation that is persuasive or even plausible.</u>  "At this [second] step of the inquiry, <u>the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral</u>." (Emphasis supplied).

ECF No. 1, Ex. 18 at 2-3.

Against this standard, the Court of Special Appeals determined the prosecutor had

provided at least three reasons for the strike: the prospective juror's status as a student; her relative youth; and a "vague, albeit uncertain, concern that she might reside near the crime scene." *Id*. at 3.   The prosecutor explained that living near the crime scene was a reason for concern because there had been problems with witnesses who were "terrified" of Snead. *Id*. at 4.  The Court of Special Appeals continued:

> The appellant now argues that the reasons advanced by the Assistant State's Attorney for the peremptory strike were a subterfuge, and that Judge Johnson was clearly erroneous in accepting them.  At the hearing before him on March 11, 1997, however, the argument that the State's reasons were a subterfuge were not advanced.  The appellant urged that using a residence possibly near the crime scene is not a good reason for striking a prospective juror because other aspects of the voir dire examination would root out any possible fear of retaliation.

> [I]f her rationale is that this person may have lived a bit too closely to the scene, <u>this juror didn't respond to any of the voir dire that would have identified her as an individual who had knowledge of the scene,</u> had knowledge of the individuals, had any kind of fear for sitting.

> We all know that there's a catch-all question on voir dire that this court uses as well as other courts that if the juror knows of any reason why they can't sit.

> <u>This juror didn't come forward and say I'm scared of these individuals.</u> I hear their reputations and all that.

> It's very easy for the State to claim that witnesses are afraid because it's very easy for witnesses simply out of a reluctance to participate to say I'm very much afraid.

> Yet, we have Mr. Snead here who's gone through two trials in which witnesses testified and, obviously they might have had some apprehension about that, but obviously all of these so-called fears that the State projects, they never come true because they aren't true. It's simply reluctant witnesses trying to make something out of nothing.

> <u>To identify that then with a particular area</u> and say, well, <u>I don't want anybody too close to this area</u> when that juror hasn't given any reason why they could not sit <u>I think is not legitimate,</u>  (Emphasis added).

The appellant's argument was not that the State's fear about possible
residential proximity was not racially neutral. It was simply that the
State's reason for the strike was not a good reason.  According to <u>Purkett
v. Elem,</u> of course, that is immaterial.  A bad reason as well as a good
reason can be race-neutral.

ECF No. 1, Ex. 18 at 5-6.

## ANALYSIS

The federal habeas statute,  28 U.S.C. § 2254 provides a "highly deferential standard for

evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997); *see also Bell v.*

*Cone*, 543 U.S. 447 (2005). This "highly deferential" standard is "difficult to meet" and

"demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563

U.S. ___, ____, 131 S. Ct. 1388, 1398 (2011); *see also Harrington v. Richter,* 562 U.S. ____,

____, 131 S. Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was

meant to be.").  A petitioner carries the burden of proof to meet this standard. *See Pinholster*,

131 S.Ct. at 1398.

A federal court may not grant a writ of habeas corpus unless the state's adjudication on

the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the

United States"; or 2) "resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and finally

determined as evidenced by the state court's issuance of a formal judgment or decree." *Young v.*

*Catoe*, 205 F.3d 750, 755 (4th Cir. 2000) (quoting *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir.

1999)).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring). "Under the ("unreasonable application") clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("The question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'") (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

A two-part test governs the standard for examining ineffective assistance claims. *See Strickland*, 466 U.S. at 687. This standard applies to appellate as well as to trial counsel. *See Smith v. Robbins,* 528 U.S. 259 (2000). To satisfy *Strickland*, a petitioner must demonstrate that the performance of his counsel was deficient by falling below an objective standard of reasonableness. *See id*. Second, a petitioner must demonstrate that he suffered prejudice as a result of the defective performance. *See id.*

The Supreme Court has made it clear that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy." *Id*. at 689.   To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." *Savion v. Murray*, 82 F.3d 593, 599 (4th Cir. 1996); *see also Lawrence v. Branker*, 517 F.3d 700, 708-09 (4th Cir. 2008).   A habeas court must attempt to "eliminate the distorting effects of hindsight," and instead "indulge a strong presumption that counsel's challenged conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.   It is "all too tempting" to "second-guess counsel's assistance." *Id*. at 689; *see also Bell*, 535 U.S. at 702.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. __, __, 130 S.Ct. 1473, 1485 (2010).   The standard must be applied with care to ensure "intrusive post-trial inquiry"  does not threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-90. Thus, in a § 2254 proceeding, it is not sufficient to convince the federal habeas court that the state court merely applied *Strickland* incorrectly; rather, a petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner. *See Bell*, 535 U.S. at 698-99.

### A. Claim of Ineffective Assistance for Failing to Raise Comparative Rejection on Direct Appeal

Snead's first claim is that Original Appellate Counsel provided ineffective assistance by failing to raise the same comparative rejection claim that resulted in a third trial for his co-defendant Booze. ECF No. 6 at 12 and 32.  In support, he asserts the comparative rejection

argument was stronger than the arguments set forth on appeal and had counsel "done any research," it would be apparent that the voir dire violated Maryland law. *Id.* at 34-35.  He further faults Braudes' reasoning for failing to raise comparative rejection (*i.e.*, the fact that defense counsel had an unused peremptory challenge) because later the Court of Appeals recognized the harm would not have been alleviated had all peremptory strikes been exhausted.  *Id.* at 36-37.

Analysis of this claim must begin by recognizing that federal habeas relief is not available for errors of state law; it is not the province of a habeas corpus court to reexamine a state court's interpretation of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67-75 (1991). Snead's claim is premised on the post-conviction court's assessment of state law at the time Braudes made his decision not to pursue comparative rejection on appeal. Paper No. 6 at 2, 9, 32-37; *see also* Exhibit 15.  As the post-conviction court explained:

> The gravamen of the Petitioner's argument is that the trial court clearly violated Md. Rule 4-312(g); his counsel noted the violation and objected but failed to raise the issue on appeal although Maryland law at the time of appeal supported the Petitioner's comparative rejection argument. Md. Rule 4-312(g) provides:
>
>> Before the exercise of peremptory challenges, the court shall designate from the jury list those jurors who have qualified after examination. The number designated shall be sufficient to provide the number of jurors and alternates to be sworn after allowing for the exercise of peremptory challenges pursuant to Rule 4-313. The court shall at the same time prescribe the order to be followed in selecting the jurors and alternate jurors from the list.
>
> Maryland case law at the time the Petitioner's counsel selected the issues he would raise on appeal, supports the contention that the comparative rejection argument would have been viable on appeal. Indeed, Maryland courts have found that a denial or impairment of the right to peremptory challenges when a defendant is deprived of the right to comparative rejection is a reversible error. *Dean v. State*, 26 Md. App. 536, 546-47 (1980), cert.denied 289 Md. 735 (1981); *Spencer v. State*, 20 Md. App. 201, 208 (1974). Therefore, this court finds that there was legal support for the Petitioner's counsel to raise the comparative rejection issue on appeal and, as demonstrated by Booze, he would have won had he done so.

However, the question before this court is not whether counsel's failure to act was wrong, rather the question is did counsel's failure to act, at that time, constitute deficient representation. This court is not to be aided by hindsight and second guess counsel's decisions. *Gilliam v. State*, 331 Md. 651, 666 (1993). Therefore, for the Petitioner to prevail, counsel's failure to act must have been both professionally and objectively unreasonable and the Petitioner must overcome the presumption that said failure to act was not sound trial strategy.

Prior to the Booze opinion, the comparative rejection doctrine and peremptory challenges seemed to be intertwined. In fact, the court in Booze stated:

> By adopting Rule 4-312(g), we have made that intent a mandate of State judicial policy, and, in the absence of a waiver or other compelling circumstance, we insist that it be followed.

*Booze v. State*, 347 Md. 51, 69 (1997). Additionally, the Maryland Court of Appeals acknowledged that "there is at least some element of indirect selection of inexorably at work in the process of elimination," and that "the right to reject need not be exercised in the dark, but is... a right of informed and comparative rejection." *Spencer*, 20 Md. App. at 314. Moreover, appellate courts in Maryland have consistently held that the right to raise jury selection issues on appeal is waived when the peremptory challenges were not exhausted. *Parker v. State,* 227 Md. 468 (1962); *White v. State*, 300 Md. 719 (1984); *Thomas v. State,* 301 Md. 294 (1984); *Booth v. State*, 306 Md. 172 (1986); *Mills v. State*, 310 Md. 33 (1987); *Bever v. State,* 4 Md. App. 436 (1968); *McCree v. State*, 33 Md. App. 82 (1976); *Emhart v. State*, 49 Md. App. 695 (1981); *Thomas v. State*. 50 Md. App. 286 (1982).

ECF No. 1, Ex. 15 at 4-6.

In this habeas petition, Snead's assertions regarding Maryland's comparative rejection law are premised largely on the Court of Appeal's opinion that post-dated Braudes' appellate representation. Paper No. 6 at 33-35. *Strickland* and its progeny specifically caution against such hindsight arguments. *Strickland*, 466 U.S. at 690. As the court explained, at the time Braudes made the decision not to raise the issue of comparative rejection of prospective jurors, there was case law in Maryland supporting the proposition that the existence of unused peremptory strikes rendered harmless any error relating to the jury composition. ECF No. 1. Ex.15 at 4-6.  Indeed, when Booze first raised the comparative rejection issue on appeal, it was rejected by the Court of

Special Appeals in part for the same reason proffered by Braudes: failure to exhaust peremptory challenges. ECF No. 1, Ex. 5 at 14-15 ("Booze's claim must fail simply because he had not exhausted his peremptory challenges when the jury was seated and the case proceeded to trial."). The Court of Appeals also recognized there existed cases for the proposition that a defendant who has not exhausted his peremptory challenges is not prejudiced.  ECF No. 1, Ex. 8 at 11; *Booze*, 347 Md. at 69-72. Although the cases were ultimately distinguished by the Court of Appeals, a reasonable attorney at the time of Snead's appeal could have concluded that unused peremptory challenges rendered harmless a claim of error based on comparative selection given the trial record.

Having reviewed the state court's decision against the highly deferential standard required for federal habeas review, this Court does not find the state court's application of clearly established federal law unreasonable.  Braudes' decision not to raise the comparative rejection on appeal, given the state of the law at that time, did not fall below an objective standard of reasonableness. The record demonstrates Braudes considered and rejected raising the comparative rejection issue in a manner consistent with providing constitutionally sound legal representation. Although Braudes found the issue to have some merit, he raised other claims instead in light of the trial court record and relevant case law at the time. Insofar as Snead faults Braudes for failing to raise the issue in the joint appeal, he cites no Supreme Court precedent that clearly establishes Braudes was compelled to join each of his co-appellant's arguments. The fact that Booze's counsel made a different decision does not render Braudes' representation constitutionally deficient. As the Supreme Court observed in *Strickland*, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689; *cf. Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995) (appellate counsel not ineffective for failing to foresee a change in law); *Honeycutt v. Mahoney*, 698 F.2d 213, 217 (4th

Cir. 1983) (same).  In sum, Snead fails to sustain his burden to establish original appellate counsel's representation was constitutionally deficient.  The state court application of clearly established federal law to the facts of the case was not unreasonable; thus,  there is no cause to disturb the decision, and federal habeas relief will be denied as to this claim.

**B.   Claim of Ineffective Assistance at *Batson* Remand Hearing**

Snead next claims his remand counsel Thomas Kane was ineffective for failing to familiarize himself with the facts surrounding jury selection and effectively challenge the prosecutor's reasons for striking prospective Juror 14, Lisa Portis. Paper No. 6 at 37-42.  Snead avers had Kane done so, he would have been able to prove that the prosecutor struck prospective Juror 14 on the basis of race with a new trial to follow.  *See id*.

Respondents counter that this claim is procedurally defaulted and without merit. A federal claim is deemed procedurally defaulted where "a state court has declined to consider the claim's merits on the basis of an adequate and independent state procedural rule." *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir.1998). A federal court cannot review a procedurally defaulted claim unless the prisoner can demonstrate cause and prejudice for the default or a fundamental miscarriage of justice.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, _U.S._, _ 131 S .Ct. 1120, 1127 (2011) (stating even wholly discretionary state-procedural rules may constitute adequate state grounds for procedural default)(internal quotations and citations omitted). "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Id*. A state procedural rule is "independent" if it does not depend upon a federal constitutional ruling, and "adequate" if it is firmly established and regularly or consistently applied by the state

court. *Yeatts v. Angelone,* 166 F.3d 255, 263–64 (4th Cir.1998).

Maryland's Post Conviction Procedure Act confers the right to one post-conviction petition for a judgment of conviction.  ECF No. 19 at 41; *see also* Md. Ann. Code, Crim. Proc. Art. §§ 7-101 and 7-103 (2008); *Gray v State*, 388 Md. 366, 375 (2005).  "[T]he court may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." Md. Code Ann., Crim. Pro. Art., § 7-104 (2008); *see also Gray*, 388 Md. at 377-82 (noting legislative intent to limit the number of post-conviction petitions filed after conviction).

Respondents assert that in 2006, Petitioner's one petition for post-conviction relief was resolved and closed.   ECF No. 19 at 43.  Later, Snead filed to reopen the proceeding, raising the claim of ineffective assistance for failing to perfect the right to a direct appeal after the May 9, 1997 sentencing hearing. ECF No. 19, Ex. 6.  Snead failed to raise this claim in either his initial post-conviction petition or in his first Motion to Reopen his post-conviction proceeding.  Snead avers it was premature to raise this claim in his First Motion to Reopen Petition for Post-Conviction Relief,  ECF No. 1, Ex. 22 at 6 and 9, an argument this Court finds unavailing.

Claims of ineffective assistance of counsel are generally raised on post-conviction review. Under the circumstances here, Snead's ineffective assistance of remand counsel claim was ripe for post-conviction review, but was not presented.  Moreover, the state post-conviction court's summary denial of Snead's second request to reopen post-conviction proceedings, which was predicated solely on matters of state procedural law, constitutes an adequate and independent state ground for denial of the instant claim.

In his reply, Snead argues that remand counsel's abandonment after filing his appeal in open court and serving the state, and the Circuit Court's failure to transmit record of appeal to the Court of Special Appeals, constitute cause excuse procedural default. ECF No. 24 at 24-47. "Cause for a procedural default exists where something external to the petitioner, something that

cannot be fairly attributed to him[,]…impeded [his] efforts to comply with the State's procedural rule." *Maples v. Thomas*, 565_ U.S._ , 132 S. Ct. 912, 922 (2012) (quoting *Coleman*, 501 U.S. at 753). "For example, 'a showing that the factual or legal basis for a claim was not reasonably available to counsel…or that 'some interference by officials'…made compliance impracticable, would constitute cause under this standard.'" *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 492 (1986)).  An attorney's abandonment of a client may also be cause to excuse procedural default.  *See Maples* 132 S. Ct. at 924 ("Nor can a client be faulted to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him.).

Even if these facts excuse procedural default, the highly deferential standard of federal habeas review "for evaluating state court [*Batson*] rulings" demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, _ U.S._, _ 131 S. Ct. 1305, 1307 (2011) (quotation omitted) (*Batson* turns on evaluation of credibility and is entitled to great deference). Every defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," *Batson*, 476 U.S. at 85–86, but not every strike of a racial minority results in a violation of that right. *See United States v. Jones*, 224 F.3d 621, 623–24 (7th Cir. 2000).  *Batson* established a three-step framework for evaluating claims of discriminatory exercise of peremptory challenges:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Golphin v. Branker*, 519 F.3d 168, 179 (4th Cir. 2008) (quoting *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991)). "[T]he decisive question [is] whether counsel's race-neutral

explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365. At the second step of the analysis, age, occupation, and demeanor can be legitimate, race-neutral reasons to strike a juror. *See United States v. Grimmond,* 137 F.3d 823, 834 (4th Cir. 1998); *see also Jones*, 224 F.3d at 625 (finding that "intuitive assumptions" are often a permissible basis for peremptory strikes, as long as they are race-neutral).

The transcript of the remand hearing demonstrates Kane vigorously argued that the reasons proffered by the prosecutor's for striking Juror No. 16, Lisa Portis were not race-neutral. Although he failed to inform the court of an available and potentially persuasive argument regarding the prospective juror's replacement, his representation, viewed in the context of his entire presentation and in light of the deference mandated by the habeas statute, does not amount to constitutionally deficient assistance of counsel under *Strickland* and its progeny.

Notably, Snead neither alleges nor demonstrates that the jury chosen unfairly considered his case, ECF No. 6, and he fails to demonstrate that the remand court would have ruled differently had counsel's representation not been deficient as alleged. Under federal habeas review, state court assessments of witness credibility are factual determinations entitled to the presumption of correctioness. *See Cagle v. Branker*, 520 F.3d 320, 323-24 (4th Cir. 2008). The Assistant State's Attorney explained she had at least three reasons for striking Juror 14. The first was the prospective juror's status as a student. The next was the possibility that Juror 14 lived near the crime scene. The third was the prospective juror's relative youth. The record is clear: the remand court found credible the prosecutor's explanations for the peremptory strike on Juror 14 as well as the other potential jurors. *See e.g*. ECF No. 1, Ex. 6 at 12, 18. The trial judge's determination of credibility is supported by the record and was reviewed and affirmed on appeal by the Court of Special Appeals. ECF No. 1, Ex. 18 at 9. ("Judge Johnson looked upon the demeanor of the Assistant State's Attorney and found her credible. Who are we to second-guess that assessment?"). There are no factual or legal grounds presented to cause this Court to

supplant the credibility findings of the state court.

The state court decision was not contrary and did not involve an unreasonable application of federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. *See* 28 U.S.C. 2254(d). Therefore, it does not meet the standard for federal habeas relief and this claim will be denied.

## CERTIFICATE OF APPEALABILTY

A Certificate of Appealability shall not issue without "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000). A petitioner satisfies this standard by demonstrating that reasonable jurists would find that an assessment of the constitutional claims is debatable and that any dispositive procedural ruling dismissing such claims is likewise debatable. *See Miller–El v. Cockrell*, 537 U.S. 322, 336–38, (2003); *Rose v. Lee*, 252 F.3d 676, 683–84 (4th Cir. 2001). Reasonable jurists would not find Petitioner's claims debatable.

## CONCLUSION

For the reasons stated herein, the petition for writ of habeas corpus is DENIED and a Certificate of Appealability shall not issue. A separate Order follows.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: January 30, 2013